**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**TRAINOR GLASS COMPANY,**     *

     **Plaintiff,**     *

                                       **Case No. 1:07-cv-01497**

**v.**                             *     **Judge Royce C. Lamberth**

**JAMES G. DAVIS CONSTRUCTION**     *
     **CORPORATION,** *et al,*
                                     *

     **Defendants.**     *

**DEFENDANT JAMES G. DAVIS CORPORATION'S OPPOSITION TO
PLAINTIFF TRAINOR GLASS COMPANY'S MOTION FOR ORDER
DISMISSING PENDING ARBITRATION AND REQUEST FOR HEARING**

COMES NOW Defendant James G. Davis Construction Corporation ("Davis"), by and

through counsel, and in opposition to the Motion for Order Dismissing Pending Arbitration and

Request for Hearing on Motion for Order Dismissing Pending Arbitration filed by Plaintiff

Trainor Glass Company ("Trainor"), states as follows:

**I.   Summary of the Argument**

The subcontract entered into between Davis and East Coast Glass Systems explicitly

provides for the arbitration of any disputes arising between the parties. Trainor concedes that

Trainor is the assignee of the East Coast Glass System's subcontract. As assignee of the

subcontract, Trainor accepts all rights and obligations under the subcontract and is bound by the

arbitration provision contained in the subcontract. The claims asserted by Trainor Glass

Company ("Trainor") in this lawsuit arise from and are related to the subcontract. Accordingly,

Trainor must arbitrate its disputes with Davis, and the pending arbitration should <u>not</u> be

dismissed. Further, an evidentiary hearing on Trainor's Motion should not be held as this Court

can determine Trainor's assignment of the East Coast Glass System's subcontract, and the

enforceability of the arbitration provision contained in the subcontract based entirely on the

papers.

## II. Factual Background

Davis is the general contractor for the construction of the Capitol Plaza I project located

at 1200 First Street, NW, Washington, D.C. (the "Project"). See Complaint ¶¶ 6, 7 and 15.

Davis subcontracted with East Coast Glass Systems to provide specified labor and materials to

the Project (the "Subcontract"). See Complaint ¶ ¶ 7 and 16. The Subcontract expressly provides

that: **"Disputes with DAVIS shall be resolved by arbitration in accordance with the rules of**

**the American Arbitration Association."** Subcontract ¶ 19 (emphasis added). A true copy of

the Subcontract is attached hereto as Exhibit A.

Plaintiff Trainor acquired the assets and liabilities of East Coast Glass Systems. See

Complaint ¶ 9. East Coast Glass Systems assigned the Subcontract to Trainor on or about

October 26, 2006. See Complaint ¶ 24, and Exhibits 3 and 4 thereto, Notices of Intent to Claim a

Mechanic's Lien, each of which identifies Trainor's work on the Project as: "more particularly

described in the subcontract between East Coast Glass Systems and the General Contractor

[Davis] dated April 4, 2005, as assigned to Claimant [Trainor] on October 26, 2006." Id.

Disputes subsequently arose between Davis and Trainor relating to the Subcontract. See

generally Complaint. On May 31, 2007, Davis filed with the American Arbitration Association a

Demand for Arbitration against Trainor relating to the Project. Davis' Demand for Arbitration is

based on the explicit terms of the Subcontract requiring the arbitration of all disputes between

the parties. A true copy of the Demand for Arbitration is attached hereto as Exhibit B. Trainor

filed with the American Arbitration Association an Answering Statement, Counterclaim, and an

Objection to Jurisdiction. A true copy of the Objection to Jurisdiction is attached hereto as Exhibit C. Trainor's Objection to Jurisdiction was denied. Trainor's arbitration Counterclaim, like its Complaint in this action and related mechanic's liens, alleges that Trainor is due Four Hundred Fourteen Thousand One Hundred Sixty-Two Dollars ($414,162.00) from Davis. A true copy of the Counterclaim is attached hereto as Exhibit D.

On or about June 22, 2007, Trainor filed multiple mechanics' liens relating to the Project. Trainor filed a Complaint in the District of Columbia Superior Court on or about July 27, 2007, seeking, inter alia, damages from Davis relating to the Subcontract.[1] The damages sought by Trainor in this action are identical to those sought in Trainor's arbitration Counterclaim. See Exhibit D.

On August 28, 2007, Davis submitted its Motion to Compel Arbitration and Stay Litigation Pending Arbitration seeking this Court's enforcement of the arbitration provision in the Subcontract, and a stay of the litigation pending before this Court. On September 14, 2007, Trainor filed its Motion for Order Dismissing Pending Arbitration ("Trainor's Motion") and a Request for an evidentiary hearing on its Motion. Davis submits this Opposition to Trainor's Motion and hearing request on the grounds set forth below.

### III. Argument

#### A. Trainor is Bound By the Subcontract.

Trainor previously admitted that it is bound by the terms set forth in the Subcontract. Specifically, Trainor states in its Notices of Intent to Claim a Mechanic's Lien that "**[T]he Claimant's scope of work is more particularly described in the subcontract between East Coast Glass Systems and the General Contractor dated April 4, 2005, as assigned to the**

---

[1] Davis filed a Notice of Removal on or about August 21, 2007, thereby removing this action from the District of Columbia Superior Court to this Honorable Court.

**Claimant on October 26, 2006."** Said Notices of Mechanic's Lien were signed under oath by Trainor's attorney. <u>See</u> Complaint and Exhibit 2 thereto. Now, in an attempt to avoid the arbitration clause contained in the Subcontract, Trainor asserts that "the subcontract […] is not part of any agreement between the parties." <u>See</u> Trainor's Motion, p. 3.

The doctrine of judicial estoppel bars a party from taking one position in litigation and later adopting an inconsistent position in the course of the proceeding. <u>Plough Inc. v. National Academy of Sciences</u>, 530 A.2d 1152, 1159 fn. 10 (D.C. 1987) (citing 4 J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice, ¶ 0.405[8] (2d ed. 1986)). The purpose of judicial estoppel is to "preclude[s] a litigant from playing fast and loose with a court of justice by changing his position according to the vicissitudes of self interest ...." <u>Porter Novelli, Inc. v. Bender</u>, 817 A.2d 185, 188 (D.C. 2003). (quoting <u>Lofchie v. Washington Square Ltd. Partnership</u>, 580 A.2d 665, 668 (D.C.1990)). The doctrine of judicial estoppel clearly prevents Trainor from asserting that it is not bound by the terms of the Subcontract after it asserted under oath that its lien rights arose pursuant to the same Subcontract. Accordingly, this Court should accept as undisputed that Trainor is bound by the terms of the Subcontract.

### B. The Subcontract Requires Arbitration of Disputes.

The Subcontract explicitly states that **"Disputes with DAVIS shall be resolved by arbitration in accordance with the rules of the American Arbitration Association."** Subcontract ¶ 19 (emphasis added). Under District of Columbia law, a written agreement to arbitrate future disputes "is valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." D.C. Code § 16-4301. <u>See</u> <u>Woodland Limited Partnership v. Wulff</u>, 868 A.2d 860, 863 (D.C. 2005).

Additionally, the Federal Arbitration Act creates a strong presumption in favor of enforcing arbitration agreements, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226-27 (1987). See National Railroad Passenger Corp. v. Boston and Maine Corp., 850 F.2d 756, 760 (D.C. Cir. 1988) (declaring that if an arbitration clause is broad, the party seeking to avoid arbitration has the burden to demonstrate that the claim is not arbitrable); AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986); Almacenes Fernandez, S.A. v. Golodetz, 148 F.2d 625, 628 (2d Cir. 1945) (holding that to make a genuine issue entitling a plaintiff to a trial by jury on the issue of whether an alleged arbitration agreement has been made, an unequivocal denial of the agreement is needed, and evidence must be produced to substantiate the denial). See also Lopata v. Coyne, 735 A.2d 931, 940 (D.C. 1999); Masurovsky v. Green, 687 A.2d 198, 204 (D.C.1996). In fact, a request to arbitrate a particular grievance "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). Therefore, this Court should enforce the arbitration provision contained in the Subcontract.

## C.  The Assigned Subcontract Requires Arbitration of Disputes

Trainor is the assignee of all East Coast Glass System's rights and obligations under the Subcontract. See Complaint ¶ 24, and Exhibits 3 and 4 thereto. Under general principles of contract law adopted by the District of Columbia, the assignee of a contract stands in the shoes of the assignor, and acquires the same rights and liabilities as if it had been the original party to the contract. D.C. Code §28-2303. See Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Systems, Inc., 448 F.Supp.2d 64, 69 (D.D.C. 2006); Fox Greenwald Sheet Metal Co. v.

Markowitz Bros., Inc., 452 F.2d 1346, 1359 n.69 (D.C. Cir. 1971).  Trainor can enforce its alleged rights under the Subcontract only by using the same remedies that would be available to East Coast Glass Systems had the Subcontract not been assigned.  Woodland, 868 A.2d at 863 ("The assignee can enforce those rights by the same remedies available to the assignor").  The mere fact that the Subcontract or any rights therein were assigned does not relieve Trainor of its obligation to submit any disputes to arbitration.  See Hosiery Mfrs.' Corporation v. Goldston, 143 N.E. 779, 780 (N.Y. 1924) ("Arbitration contracts would be of no value if either party thereto could escape the effect of such a clause by assigning a claim subject to arbitration between the original parties to a third party"); Lake Beechwood Country Club, Inc. v. Peekskill Manor, Inc., 2 A.D.2d 865, 865 (N.Y. 2d Dep't 1956) (holding that an assignee of an agreement cannot resist arbitration on the ground that it is not a party to the agreement it seeks to enforce). See also 1 Domke on Com. Arb. §13:13.

### 1.  The Subcontract Was Assigned On October 26, 2006 By Davis' Consent to the Assignment.

Davis' written approval to any assignment of the Subcontract is required under paragraph 30 of the Subcontract.  See Subcontract, Exhibit A hereto.  On or about October 26, 2006, East Coast Glass Systems requested Davis' approval of the assignment of East Coast's rights and obligations under the Subcontract to Trainor.  See Exhibit C hereto.  In addition to its request for written approval of said assignment, East Coast Glass Systems requested additional information from Davis, including the value of the Subcontract and the balance of the Subcontract remaining to be earned.  Davis gave its written approval to the assignment on or about October 26, 2006 through a document titled "Consent to Assignment of Subcontract."  Davis also provided the values requested by East Coast Glass Systems in its written approval of the assignment, but stated that such values were subject to "pending change orders and claims which have not been

- 6 -

resolved." See Exhibit C hereto.  Thus, approval by Davis, the prerequisite for assignment, was complete and the Subcontract was thereby assigned to Trainor.

Subsequently, Trainor returned to Davis a copy of the "Consent to Assignment of Subcontract," deleting from paragraph 2 the phrase "except for pending change orders and claims which have not yet been resolved."[2]  Davis declined to modify its representation of either the adjusted value of the subcontract or the balance to be earned.  Trainor's attempt to condition Davis' approval of the assignment is of no effect.  If Trainor wished to assume East Coast Glass System's Subcontract with limitations, it could have refused the assignment.  Instead, Trainor went forward and performed the assigned Subcontract previously approved by Davis.  Trainor has no right to unilaterally place subsequent conditions on the approved assignment. Accordingly, it is clear that Trainor accepted the assignment of the Subcontract approved by Davis in writing on October 26, 2006, and that Trainor is the assignee of all terms and conditions under the Subcontract, including the arbitration agreement.

## 2.  <u>Any Assignment of the Subcontract Requires Arbitration of Disputes</u>

It is clear that the parties agreed to an assignment of the Subcontract on October 26, 2006 on the terms set forth in the Consent to Assignment of Subcontract. See Exhibit C hereto.  However, regardless of how and when East Coast Glass Systems' rights and obligations under the Subcontract were assigned to Trainor, the Subcontract requires the arbitration of disputes. Therefore, barring an express provision in the assignment to the contrary, arbitration of disputes is required. The Consent to Assignment dated October 26, 2006, the "Assignment containing

---

[2] Interestingly, Trainor did not alter paragraph 1 where Davis had inserted the same phrase.

Trainor Glass's Modification" and the alleged oral assignment[3] do not limit or void the arbitration provision of the Subcontract.  Further, both the Consent to Assignment dated October 26, 2006, and the "Assignment containing Trainor Glass's Modification" expressly provide that **"Trainor shall be bound directly to Davis under the terms and conditions of the subcontract** and any other contract documents referenced or incorporated herein after 25 October 2006 in accordance with the provisions of the contract."  See Exhibits B and C to Trainor's Motion, ¶ 6 (emphasis added).   Accordingly, Trainor, the assignee of the Subcontract, is bound by the terms of the Subcontract, including the arbitration provision.  Therefore, Trainor is required to arbitrate any disputes with Davis.

### D.  Trainor's Request for an Evidentiary Hearing Should be Denied

When a court is presented with a dispute arising out of a contract containing an agreement to arbitrate, the court is charged with the limited task of determining whether the agreement to arbitrate is enforceable and deciding whether arbitration should be compelled pursuant to that agreement.  Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Systems, Inc., 448 F.Supp.2d 64, 67 (D.D.C. 2006).  This Court can make such a determination by considering only the papers submitted by the parties in this case.  No testimonial or other additional evidence is required or appropriate.

The Subcontract is a completely integrated agreement.  See Subcontract, ¶ 33 ("This instrument is the entire Agreement between the parties").  The terms and conditions of the Subcontract are unambiguous as is the arbitration provision contained therein.  See Subcontract, ¶ 19. The parol evidence rule establishes that "extrinsic or parol evidence which tends to

---

[3] Trainor asserts that "the parties' oral agreement encompassed the scope of the work, price, and exclusion of all East Coast Glass defaults."  See Trainor's Motion, p. 6.  Trainor makes no mention of any agreement to void the arbitration provision contained in the Subcontract.

contradict, vary, add to, or subtract from the terms of a written contract must be excluded."
Affordable Elegance Travel, Inc. v. Worldspan, 774 A.2d 320, 327 (D.C. 2001) (quoting Fistere, Inc. v. Helz, 226 A.2d 578, 580 (D.C. 1967)). Therefore, "when the parties to a contract have reduced their entire agreement to writing, the court will disregard and treat as legally inoperative parol evidence of the prior negotiations and oral agreements." Stamenich v. Markovic, 462 A.2d 452, 455 (D.C. 1983) (quoting Giotis v. Lampkin, 145 A.2d 779, 781 (D.C. 1958)). In determining whether to enforce the arbitration provision contained in the Subcontract, no parol evidence should be heard or considered by this Court. The Court can determine the enforceability of the arbitration provision by considering only the four corners of the Subcontract. Further, for the purposes of determining whether Trainor's disputes are subject to arbitration under the Subcontract, it is irrelevant how and when Davis consented to the assignment. It is undisputed that the Subcontract was assigned to Trainor. There is no additional evidence that can be heard by this Court to assist in its consideration of the enforceability of the arbitration clause contained in the Subcontract. Accordingly, a hearing should not be held to consider additional evidence.

## IV. Conclusion

The Subcontract explicitly provides that any disputes between the parties to the Subcontract shall be resolved by arbitration. Trainor and Davis are clearly parties to the Subcontract, and the disputes underlying this action arise from the Subcontract. Therefore, Trainor and Davis must submit their disputes to arbitration and no further evidence should be heard by this Court. Accordingly, for all the foregoing reasons, Davis respectfully requests that this Honorable Court enter an Order denying Trainor's Motion for Order Dismissing Pending Arbitration and Request for Hearing on Motion for Order Dismissing Pending Arbitration.

Dated: September 28, 2007                         Respectfully submitted,


                                                          /s/
                                                  Stephen M. Seeger (D.C. # 431258)
                                                  Emily D. Gooding (D.C. # 496227)
                                                  Quagliano & Seeger, P.C.
                                                  2620 P Street, N.W.
                                                  Washington, D.C. 20007
                                                  Phone: (202) 822-8838
                                                  Fax:    (202) 822-6982
                                                  Email: sseeger@quagseeg.com

                                                  **_Counsel for Defendant_**
                                                  **_James G. Davis Construction Corporation_**

                        **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September, 2007, Defendant James G. Davis

Construction Corporation's Opposition to Plaintiff Trainor Glass Company's Motion for Order

Dismissing Pending Arbitration was served through this Court's electronic case filing system and

mailed first-class with adequate postage prepaid to:

        Kevin M. Tracy, Esq.
        McNamee, Hosea, Jernigan, Kim,
            Greenan & Walker, P.A.
        6411 Ivy Lane, Suite 200
        Greenbelt, Maryland 20770
        **_Counsel for Plaintiff_**
        **_Trainor Glass Company_**


                                                          /s/
                                                  Emily D. Gooding




                                - 10 -

James G. Davis Construction Corporation





12530 Parklawn Drive
Rockville, MD 20852
301.881.2990
301.468.3918 FAX
www.davisconstruction.com

## SUBCONTRACT AGREEMENT made as of  April 04, 2005

Agreement No. 15-2315-017
(Accounting code: 08-800  S–)

**BETWEEN the Subcontractor:**

East Coast Glass Systems
715 E. 7th St.
Richmond, VA  23224
Attn: Bruce Costner
Phone: 804-291-1540          Fax: 804-291-1430

ENTERED SEP 2 7 2005

**and the Contractor:**

James G. Davis Construction Corporation
Manager: Peter Ege
Phone: 301-881-2990          Fax: 301-468-3918
Email: pege@davisconstruction.com

## The Contractor and Subcontractor agree as follows.

**1.   THE PROJECT**

Capitol Plaza 1

1200 First Street, NE
Washington, DC
Phone: 202-842-3725          Fax: 202-842-3760          Superintendent: Rusty Rowles

**2.   THE WORK**

Subcontractor shall furnish anything necessary to complete in place the **Glass & Glazing Systems** in strict accordance with the Contract Documents.

**3.   THE CONTRACT SUM**

The Contractor shall pay the Subcontractor in current funds for performance of this Contract: <u>**$4,087,171.00  FOUR MILLION EIGHTY-SEVEN THOUSAND ONE HUNDRED SEVENTY-ONE DOLLARS AND ZERO CENTS**</u>  in partial payments as hereinafter described.

**4.   THE CONTRACT DOCUMENTS**

The contract documents for this Subcontract consist of this Agreement and the following listed documents:

| Item | Description | Date |
|---|---|---|
| Exhibit A | Job Safety Standards | April 15, 2003 |
| Exhibit B | General Scope of Work | February 09, 2005 |
| Exhibit C | Trade Scope of Work | March 25, 2005 |
| Exhibit D | Construction Schedule | January 18, 2005 |
| Exhibit F | Contract Drawings and Specifications | May 31, 2005 |
| Exhibit J | Application for Payment | 12/27/05 |

PRE    Addendum A

**5.   BONDS**

Contract price includes the sum of **Included in contract sum** to cover the Subcontractor's cost for the bond. The Subcontractor shall furnish a performance and payment bond in satisfactory form and substance, with surety's consent to changes in price and time of performance necessary to conform to Prime Contract requirements. Furnishing of said bond shall be a condition precedent to Contractor's obligation to release partial payments.

{00001

Subcontractor Initial _____          Contractor Initial  PRE

Printed On: 5/31/2005 11:00:19AM          Version 6.10.03          **EXHIBIT A**

Capitol Plaza 1
East Coast Glass Systems / DAVIS Agreement No. 15-2315-017

## 6.  INSURANCE

To the fullest extent permitted by applicable state law the Subcontractor shall indemnify, save harmless DAVIS and the Owner from any and all claims, and liabilities for property and personal injury, including death, arising out of or resulting from or in connection with the execution of the work, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder. Subcontractor's obligation is independent from, and is not limited in any manner by, Subcontractor's insurance coverage. Said indemnity shall be insured from acceptable insurance carrier, with minimum of A.M.Best Rating of A VIII, naming DAVIS as an additional insured, by ISO form CG 2010, 11/85 edition, endorsement or equivalent, for the limits of:

Comprehensive General Liability Insurance
    Each Occurance                                                    $1,000,000
    Aggregate                                                           $2,000,000
    (Includes a per project aggregate)

Worker's Compensation (No requirement for additional named insured) $ Statutory Limits

Employer's Liability Insurance
    Each accident injury limit                                      $100,000
    Policy limit for disease                                        $500,000
    Each employee for disease                                       $100,000

Vehicular Liablity Insurance for all vehicles used by Subcontractor, its servants, agents, Subcontractors, and suppliers on job site.
    Combined single limit                                           $1,000,000

Explosion, Collapse & Underground                                    N/A

Umbrella / Excess Liability                                          $5,000,000

The general liability policy must indicate that the coverage is primary and non-contributory to any insurance of the insured's. It should also indicate a per project aggregate applies.

Policies may not be cancelled without adequate substitution prior to cancellation. The Subcontractor shall submit insurance certificates to DAVIS prior to commencement of work, but in no event later than (60) days after signing contract. DAVIS is to be given thirty (30) days written notice of cancellation of any policy. Upon request, Subcontractor shall provide to Contractor certified copies of all insurance policies providing required insurance and all endorsements pertaining there to.

## 7.  SPECIAL NOTES

    a) Unless otherwise stated, applications for payment for work projected through the end of the month are due in our office, in original form, not later than the 20th of each month. Should the 20th not occur on a business day, applications for payment are due the preceding business day.

    b) The complete set of submissions for Architect / Engineer approval shall be submitted by the Subcontractor to the Contractor no later than 6/21/05, and shall include without limitation at least the following items:
        Detailed shop drawings, product data, and samples as listed in the project specifications and drawings.
        Submissions to be provided in a timely manner to allow for review and not impact the project schedule.

## 8.  FLOW DOWN RELATIONSHIP

The Subcontractor is bound to James G. Davis Construction Corporation (DAVIS) in the same way DAVIS is bound to the Owner and shall bear all rights and liabilities with respect to DAVIS as DAVIS has with respect to the Owner, except that this Subcontract shall govern any inconsistent provision of the Prime Contract.

## 9.  PRICE AND PAYMENT

The Subcontract price shall be paid in partial payments, when received by DAVIS from the Owner, to Subcontractor in trust for the payment by Subcontractor for work in place and material on jobsite. Ten percent (10%) retention shall be withheld until final payment is due, except that retainage will be reduced when and to the extent the Owner's retainage withheld from DAVIS is reduced. Final payment shall be due after completion of all work, acceptance by the Owner, compliance with all Subcontract obligations, and receipt of final payment from the Owner, which items shall be conditions precedent to the making of final payment to Subcontractor. DAVIS is entitled to proof of payment for labor, material, and services used before any payment due. Material paid for shall belong to DAVIS, but shall remain in the care, custody, and control of Subcontractor and stored at Subcontractor's risk. Subcontractor shall furnish guarantees and all other documents required by the Prime Contract for the Subcontractor's work, including releases as a condition precedent for payment. Liquidated damages withheld by Owner will be assessed against Subcontractor for delay attributable to Subcontractor's fault. The Subcontractor shall itemize the contract price as a basis for establishing value of work completed and partial payments.

## 10.  SHOP DRAWINGS, SAMPLES, AND DATA SUBMISSIONS

All submittals such as shop drawings, catalogs, samples, and material lists required by Prime Contract which pertain to this work shall be furnished complete and timely. Subcontractor shall be responsible for delays because of failure to do so and for any deviation from plans and specifications. All deviations from the Prime Contract documents must be noted clearly on the submittals, and by separate cover letter the Subcontractor shall state reasons for the deviation and refer to the applicable contract provision.

Capitol Plaza 1
East Coast Glass Systems / DAVIS Agreement No. 15-2315-017

**11. TIME IS OF THE ESSENCE**
Subcontractor shall proceed with work at such time and in such sequence as DAVIS may direct, including overtime performance as necessary and as required by Schedule of Progress, which may be subject to change as working conditions require. If overtime is required solely to accelerate project completion, it shall be authorized in writing and be paid for by DAVIS. ~~Payments due may be withheld to insure timely progress and completion of work.~~ The Subcontractor shall be liable for all losses and damages incurred by DAVIS (including consequential damages) due to inexcusable delay of the Subcontractor in the performance of the work, including delays costs not reimbursable from the Owner due to inexcusable incurred delays of the Subcontractor.

*Revised by Addendum A attached PRB*

**12. EXTENSIONS OF TIME**
Subcontractor shall be entitled to an extension of time for performing and completing the work covered by this agreement upon the same terms and conditions an extension of time is allowable and only to the extent actually allowed to DAVIS by Owner, or its representative, under the terms of the Prime Contract. Notice of the excusable delay shall be given to DAVIS in writing within three (3) calendar days from the beginning of said delay in order that DAVIS may in turn notify the Owner, and if not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject only to the disputes procedure provided in the Prime Contract.

**13. DAMAGES FOR DELAY**
DAVIS shall not be liable to Subcontractor for unforeseeable delay occurring beyond DAVIS's control or for delay caused by Owner or other subcontractor. Subcontractor shall be entitled to reimbursement for any damages for delays recovered from the Owner only, and the Subcontractor shall have the right, at its expense, against the Owner to exercise all provisions of the Prime Contract to recover said damages. Time extension only shall be granted for delays caused solely by DAVIS.

**14. SCHEDULE**
DAVIS intends to schedule this project using CPM Schedule techniques. In such event, Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of DAVIS's written notice and request.

**15. DEFAULT TERMINATION**
The following shall be deemed a breach of this Agreement: Failure to fulfill any obligation of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities; failure to pay for labor and material, payroll taxes, contributions, or insurance premiums; interference with the performance of the work by others for any reason; and an act of bankruptcy. If the Subcontractor breaches the Subcontract, DAVIS may terminate Subcontractor's right to proceed upon three (3) days written notice. DAVIS may then have the work completed ~~and may use Subcontractor's material, supplies, tools, and equipment to complete.~~ Subcontractor and its surety shall continue liable for all costs to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by Owner and other liabilities which may result from the default and breach, without waiver or any other rights or remedies available to DAVIS, ~~including right of setoff and collection of any funds which may be due to Subcontractor under other subcontracts with DAVIS.~~ *PRB*

**16. EXTRA WORK**
Only extra work authorized by DAVIS as an extra or change in writing shall be paid for. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the costs of said work plus fifteen percent (15%) for overhead, profit, supervision, and small tools, which will constitute the entire amount due the Subcontractor for the extra work.

**17. OWNER CHANGES**
Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute ~~and appeal, provided reservation and exercise of said rights do not interfere with the progress of the work.~~

**18. CONTRACT INTERPRETATION**
DAVIS interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if claim in writing is made within five (5) days after ruling and direction.

**19.. DISPUTES**
Disputes arising out of Owner acts, omissions, or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise those rights at its sole cost and shall be bound thereby. DAVIS shall have no direct liability except to give Subcontractor opportunity to exercise rights in the Prime Contract. Disputes with DAVIS shall be resolved by arbitration in accordance with the rules of the American Arbitration Association. Disputes shall not interfere with the progress of the job. Work shall proceed as ordered, subject to claim.

**20. BACKCHARGES**
All charges and backcharges assessed by DAVIS against Subcontractor shall be deemed accepted unless rejected in writing within thirty (30) days.

**21. PLANT AND CLEANUP**
Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective, and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris, etc., on a daily basis, unless DAVIS directs otherwise. Upon completion of the subcontract work, all Subcontractors' materials, equipment, etc., must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit DAVIS to do so and backcharge Subcontractor for the cost. If Subcontractor uses DAVIS's hoist, scaffolding, or facilities, it will be responsible for the operating expenses of such equipment when in use for Subcontractor's benefit.

Subcontractor Initial _____    Contractor Initial _PRB_    **00003**

Capitol Plaza 1
East Coast Glass Systems / DAVIS Agreement No. 15-2315-017

## 22. BANKRUPTCY AND DELINQUENT TAXES
In the event of any act of bankruptcy or Subcontractor creditor claim against DAVIS or its surety, or notice of levy involving delinquent taxes, DAVIS shall have the right to withhold payments and apply the same to secure performance of the Subcontract without prejudice to all other rights against Subcontractor or its surety.

## 23. RESPONSIBILITY FOR WORK IN PLACE
The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve DAVIS of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon DAVIS to discover any mistakes, errors, omissions, or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations, or omissions or for errors of any sort in its drawings.

## 24. LICENSES AND FEES
Subcontractor shall be responsible for all taxes, permits, licenses, and fees necessary to perform its work, including any increase therein, if any, during the life of the Subcontract.

## 25. LABOR FORCE
Subcontractor shall be responsible for performance regardless of any interference of any trades council or other labor or union organization. Any work stoppage by employees which will unreasonably delay the work will be a breach of the Subcontract subject to the rights set forth in Paragraph 15.

## 26. NONDISCRIMINATION
Subcontractor shall not discriminate against any employee or applicant for employment, advancement, transfer, layoff, or termination because of race, religion, color, sex, or national origin. All Equal Opportunity or affirmative action requirements of the Prime Contract shall be obligations of the Subcontractor.

## 27. SUPERINTENDENCE
Subcontractor shall employ on the jobsite a competent Superintendent, satisfactory to DAVIS with full authority to act on Subcontractor's behalf. DAVIS shall have the right to require replacement because of incompetence.

## 28. PATENT INFRINGEMENT
Subcontractor shall indemnify DAVIS from any use or infringement of patents.

## 29. TERMINATION FOR CONVENIENCE
DAVIS shall have the right to terminate this agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. Termination for default under Paragraph 15, if wrongfully made, shall be treated as a termination for convenience. Settlement of the contract shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If not, the Subcontractor shall be paid only the actual cost for work and labor in place, plus fifteen percent (15%), or a pro rata percentage of the Subcontract equal to the percentage of completion, whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work.

## 30. ASSIGNMENT
No assignment hereunder is allowed without written approval of DAVIS.

## 31. NOTICES
All notices required under this subcontract or the Prime Contract shall be addressed to Contractor's office located at 12530 Parklawn Drive, Rockville, Maryland 20852. Notices required by the various provisions of the Prime Contract (not otherwise dealt with herein) shall be due in DAVIS's office in one-half (1/2) the time specified in the Prime Contract so that DAVIS will have sufficient time to forward its notice within the required period. Failure of Subcontractor to forward notices in a timely manner as required by the various equitable adjustment provisions of the Prime Contract shall operate to waive its rights to any such adjustment if the Owner rejects the claim.

## 32. OWNER APPROVAL
This Agreement is contingent upon Subcontractor or its product being approved by the Owner. If a disqualification occurs because of failure to comply with and strictly fulfill the obligations herein, said failure shall be deemed a breach by the Subcontractor. Any other rights of disqualification by Owner shall render this Agreement null and void.

## 33. RETENTION AND SEVERABILITY
Attachments are part of this Agreement. If this Agreement is retained by Subcontractor without executing and returning same within ten (10) days, it shall be deemed accepted; however, acceptance in writing is a condition precedent to payment due hereunder. The Subcontractor shall not deal directly with or work directly for Owner. This instrument is the entire Agreement between the parties. If any provision herein is held to be invalid by any competent court, the remaining Agreement shall survive. This Agreement shall control any inconsistency in any documents referred to or incorporated by reference.

## 34. OSHA
Subcontractor shall comply with OSHA and State-equivalent standards and requirements and shall indemnify DAVIS from any failure to do so, including fines and abatement costs and delays to project. Failure to comply shall be a breach of contract, subject to the provisions of Paragraph 15.

## 35. LIENS
In the event that liens are filed by anyone with respect to the work for which Subcontractor is responsible under this Subcontract, Subcontractor agrees to have the same discharged, by posting a bond with the appropriate authorities, or otherwise, within five (5) days notice from DAVIS.

Subcontractor Initial _____    Contractor initial _____

Capitol Plaza 1
East Coast Glass Systems / DAVIS Agreement No. 15-2315-017

---

**36.  MISCELLANEOUS**

Any disagreement between the parties arising out of or relating to this Subcontract, including the breach thereof shall be governed by the law of the place where the Project is being constructed.

This Agreement the day and year first written above.

Subcontractor:
East Coast Glass Systems

| | | |
|---|---|---|
| Signature | Printed Name | Title |

Contractor:
James G. Davis Construction Corporation
Virginia Contractor Registration Number 8107

| | | |
|---|---|---|
| Signature | Printed Name | Title |

Subcontractor to sign and return both copies of the subcontract to the contractor.  DAVIS will then sign and return one copy for the Subcontractor's files.

James G. Davis Construction Corporation



**DAVIS**

Exhibit A
Job Safety Standards
April 15, 2003

Project: Capitol Plaza 1 (15-2315)

The James G. Davis Construction Corporation will expect all employees and subcontractors to comply with and enforce the Job Safety Standards which include, but shall not necessarily be limited to, those listed below. These Job Safety Standards are specifically included in every James G. Davis Construction Corporation Subcontract Agreement. It is the responsibility of every individual subcontractor to insure they are followed as a condition of employment on every Davis job site. These Job Safety Standards are a contract document and will be strictly enforced.

1.   Each subcontractor performing work on the project is contractually obligated to comply with all statutory safety requirements as well as any Davis Policies and/or Job Site Rules articulated in the bid and subcontract documents.

2.   It is safety policy that all Davis employees (including Officers, Project Managers & Assistants, Supervisors, Truck Drivers, etc.), Subcontractors & their employees, deliverymen, vendors, and visitors will wear hard hats and eye protection (safety glasses) at all times when on any Davis project site. Hard hats and safety glasses are required from the time an individual enters the project site until he/she exits the site, with the exception that hard hats and safety glasses are not required while inside fully enclosed field offices or inside vehicles. Hard hats and safety glasses will be provided for visitors.

3.   It will be the responsibility of each subcontractor to supply their employees with hard hats and safety glasses, and to take appropriate steps to insure that they are worn as required. Subcontractor employees reporting to a Davis project site without hard hats or safety glasses will be asked to take one of the following options:
a.   Leave the site until he/she has his/her own hard hat and safety glasses.

b.   The Davis site office will loan the worker a uniquely colored courtesy hard hat or safety glasses for which the worker and his/her foreman must sign a receipt. If the courtesy hard hat or safety glasses are not returned to the Davis site office within 24 hours, in the same condition as they were when issued, the subcontractor's office will be charged $20.00 for each item. This will be explained to the worker and the foreman when the hard hat or safety glasses are issued. This option is available only on the first day that the worker reports to the project site.

4.   Every employer (Subcontractor) shall provide a written safety inspection report of his work area(s) on a weekly basis. Any safety violations noted must have been corrected immediately.

5.   Safety equipment will be provided as needed (i.e., eye protection, safety belts, etc.) by each individual subcontractor for their employees.

6.   First Aid facilities on the job will include a First Aid Kit provided by each individual subcontractor.

7.   James G. Davis Construction Corporation Safety Representative will hold general safety meetings on a regular schedule. A representative from each subcontractor currently working on the site will be expected to attend. This meeting will be for purposes of discussing overall job site safety.

8.   Education meetings (Toolbox Talks) must be conducted for all DAVIS employees. These meetings should be held once each week, for at least 15 minutes. To be meaningful, the meetings must relay safety information relating to the actual work being conducted and give the employees an opportunity to express their concerns.
The meetings must be recorded and all attendees are required to sign a sign-in sheet, both to ensure attendance and to maintain a record of the information discussed.
-    The Safety Meetings are not exclusively reserved for DAVIS employees. Subcontractor representatives are always welcome to attend (and even conduct, if appropriate) our safety meetings.
-    Safety meetings are to be conducted on all DAVIS job sites on a weekly basis. If you are the only DAVIS employee on the site, the requirement still applies. Pick up your Tool Box Talks notebook, read one or more lessons, fill out a record form and sign it.

9.   Tool box safety meetings shall be held weekly by each subcontractor. A copy of the instructional material and attendance report shall be provided to the Davis project superintendent upon conclusion of the meeting.

000006

Project: Capitol Plaza 1 (15-23 ᵗʰ)

Exhibit A

10.  The following is a list of actions which are specifically prohibited.  Violation of any of these rules will result in disciplinary action which can possibly include discharge from the job:

    a)  The drinking of alcoholic beverages and/or the use of mind altering substances by DAVIS employees or subcontractors on DAVIS project sites is strictly prohibited.  No DAVIS employee or subcontractor may be permitted to enter or remain on a DAVIS project site if that individual has been drinking alcoholic beverages or using mind altering substances.

    b)  Smoking in unauthorized areas.  "No Smoking" signs will be posted in each area where smoking is not allowed.

    c)  Engaging in activity in areas other than that designated by employee's primary employer.  Wandering about the project and i mpeding progress of others is not permitted.

    d)  Engaging in horseplay.

    e)  Fighting on the job site.

    f)  Illegal possession, selling or use of narcotics or non-prescribed tranquilizers or pep pills on company premises.

    g)  Possession of deadly weapons

    h)  Open fires are prohibited.  This would also include cooking or heating food on the property.

    i)  Defecating or urinating in places other than the designated sanitary facilities.  The sanitary facilities will be in line with OSHA regulation.

11.  Union representatives and Business Agents are always welcome on DAVIS jobs.  However, any such personnel visiting the project are to check in first with the Project Superintendent or Assistant Superintendent at the DAVIS Construction office.  Visitors are expected to comply with all security, safety and traffic regulations.

12.  Fire extinguisher must not be tampered with, removed or hidden behind other materials.  Clear access to the extinguisher must be maintained at all times.  One approved fire extinguisher must be provided at each stair on each floor with a minimum of one F/E per 3,000 s.f.  Travel distance from any point to the nearest extinguisher may not exceed 100 feet [1926.150(2)(c)(i)].  Fire extinguishers specific to a subcontractor's work, i.e. welding, torch cutting, etc. shall be provided by the subcontractor at the location of the work as required by the OSHA Standards.

13.  Subcontractors are required to provide their own fire protection near:

    a)  Arc or gas welding or cutting operation

    b)  Grinding of any material which produces spark

    c)  Any other fire protection hazard

14.  Safety cables and barricades must always be returned to a safe condition by anyone removing or altering the device after they have been moved or removed for necessary work at the end of each work day or immediately following completion of the work whichever is more restrictive.  Safety cables or barricades not replaced by the subcontractor who removes or alters them will be replaced by DAVIS at the subcontractor's cost.

15.  Until such time as the exterior wall is installed, it is emphasized that all workmen are required to conform to all safety regulations when working outside the perimeter safety cable.

16.  Materials stockpiled on floors must be strapped, chocked, or otherwise secured so they will not roll or blow off the building.

17.  It is the responsibility of each of the subcontractors to account for all of their employees throughout the day and at the end of each workday.

18.  Debris must be cleaned up and removed from the building daily by each contractor or subcontractor who creates such debris.

19.  Water spills must cleaned up immediately.

20.  When a subcontractor has completed any items of his work on a given area, he will be expected to remove all surplus materials from that area and leave it in a clean condition.

21.  Each subcontractor is responsible for protecting his materials against damage from elements of the weather, theft, and vandalism.

22.  Do not disturb, misuse, damage or remove any material belonging to others, whether it is installed or in stockpiles.  This is particularly emphasized with regard to finished surfaces, including, but not limited to, windowwall, roofing, and sheetrock surfaces.

23.  Structural members may not be cut, notched, or otherwise altered without prior permission of the Project Superintendent and the Structural Engineer.

24.  All floor and wall penetrations must be sealed with non-combustible materials as defined in the specifications.

25.  Safety glasses do not always provide adequate eye protection.  Wear safety goggles or full face shields in addition where additional protection is required..

26.  Make sure workmen are licensed before allowing them to use powder-actuated tools.  Make sure that the license is for the particular tool the workman is using.  A Ramset license is no good for an Omark tool and vice versa.  Be sure the license has not expired.  Safety regulations dictate that the workman must have the license on his person.

27.  Prior to core drilling holes thru any concrete deck:

    a)  Secure permission from Project Superintendent to drill the hole in order to be certain that the hole does not penetrate any of   the electrical ductbank.

    b)  In the case of post-tensioned concrete slabs, no core drilling is permitted prior to the post-tension cables being located by X-ray.

    c)  Be sure areas below the drilled area is secured so that if the core falls thru, there is no danger of injuring anyone below.  Provide a watchman below if conditions so require.

00007

Project: Capitol Plaza 1 (15-231⁵,

Exhibit A

28. The telephone inside the DAVIS office will be made available to subs on an emergency basis only. Subcontractors are expected to make their own arrangement for regular phone service.

29. Each subcontractor is required to provide the following facilities for their employees:
    a) Change house
    b) An approved lunch area
    c) Drinking water and cups
    d) Trash receptacles for lunch debris and drinking cups

30. James G. Davis Construction Corporation will have on-site trash and debris "dumpster". Subcontractors will be required to keep the work place in a clean and orderly fashion on a continuous basis. On a weekly basis, subcontractors shall provide labor in order to clean up the entire project site. Scrap materials (excess wire, pipe cutoffs, scrap drywall, boxes, etc.) shall be cleaned up on a daily basis and placed in the dumpster. DAVIS will pay for material disposal costs offsite unless otherwise noted in the Bidding Requirements, Invitation for Bids, or Scope of Work Outline.

31. Flammable liquids or gas, such as gasoline, propane, diesel fuel, etc. shall only be stored inside the building in approved containers or fire resistant cabinets. We prefer that subcontractors use electrical or air-operated equipment for interior tasks.

32. Fire walls, fire-rated floors, and fire doors are to be kept closed whenever possible. If a fire barrier has to be opened, it must be closed—either temporarily or permanently—before workmen leave the area.

33. All new construction which improves the building's fire resistance and egress will be installed as soon as possible.

34. All requirements of OSHA relating to fire (fire extinguishers, electrical, storage of materials, construction, etc.) are to be enforced and corrected by everyone on the job. Violations are to be reported to DAVIS' Safety Compliance Representative.
    Standpipes: In all structures in which standpipes are required, or where standpipes exist in structures being altered, they shall be brought up as soon as applicable laws permit, and shall be maintained as construction progresses in such a manner that they are always ready for fire protection use. The standpipes shall be provided with Siamese fire department connections on the outside of the structure, at the street level, which shall be conspicuously marked. There shall be a least one standard hose outlet at each floor.

35. If, in the opinion of DAVIS, any subcontractor fails to maintain appropriate levels of cleanliness and safety on the job site, DAVIS shall have the right to stop the operations of the subcontractor and cause the conditions to be corrected. All costs (overtime, inefficiency, etc.) due to correcting the condition and any costs associated with crew delays shall be borne by the offending contractor.

36. Sturdy work shoes or boots must be worn by all workers. The wearing of sneakers or similar soft shoes or sandals is not permitted unless they have steel toe caps and are certified as safety shoes by the manufacturer. Foot guards or safety shoes must be worn when using tampers, jackhammers or similar tools. The work shoes must be in good condition; shoes with worn heels, worn or thin soles, or damaged uppers must be replaced.

37. Excessively loose, baggy or torn clothing that could become caught in machinery or otherwise cause or contribute to an accident is prohibited. All employees are expected to wear full length trousers and shirts when on DAVIS projects. Clothing displaying obscene or offensive messages is forbidden.

38. Motor Vehicles:
    a) The DRIVER is responsible for the safety of passengers and cargo stability.
    b) Seat belts must be worn by the driver and all passengers at all times.
    c) Obey all speed limits and other traffic regulations.
    d) Engine must be shut off when refueling.
    e) Personnel may not ride in the bed or on the bumper of any truck.
    f) When vision to the rear is obstructed in any way, a flagman should direct the backing of the vehicle.
    g) Drivers must be licensed to operate the specific equipment in accordance with the Commercial Drivers License Act.

39. Ladders
    a) Inspect ladders before each use.
    b) Ladders are not be painted except for periodic inspection color coding, numbering or identification.
    c) Ladders are not to be used to support scaffold boards, as work benches or for any use other than their intended purpose.
    d) Only one person shall be on a ladder at any time.
    e) Metal ladders must not be used in electric welding operations or near electrical services or lines.
    f) Do not carry tools while ascending or descending ladder. Use a hand line.
    g) Ladders with broken or missing rungs, split side rails or other defects shall not be used.
    h) Ladders shall be placed on a substantial base, and the area around the top and bottom of the ladder shall be kept clear.
    i) Straight ladders must be secured at all times while in service.
    j) The foot of the ladder should be placed approximately 1/4 of its length away from the vertical plane of its top support.
    k) The top of the ladder must extend at least three feet (3') above its supporting point when used for access to an elevated area.
    l) Extension ladders must be overlapped by a length of at least three (3) rungs.
    m) Do not stand on the top two steps of a stepladder.
    n) Stepladders must be opened completely with all four feet resting on a sound level footing.
    o) Two stepladders shall not be used as supports for scaffold boards.
    p) Only one employee at a time will be permitted to work on a stepladder.
    q) Stepladders may not be "cut down" or otherwise altered in any manner that compromises their strength.

00008

Project: Capitol Plaza 1 (15-2315)

40.  Scaffolding
   a)   Scaffolds shall be erected on sound, rigid footings.  Unstable objects such as loose brick, loose concrete blocks, boxes, barrels, etc. shall not be used to support scaffold frames or planks.
   b)   Standard guardrails and toeboards shall be installed on all open sides and end of scaffold platforms more than 10' above the ground or floor.
   c)   Employees must utilize safety belts while working on any scaffold platform that is not provided with a standard guardrail or a complete deck.
   d)   Employees are not permitted to ride on manually propelled mobile scaffolds.
   e)   Prior to use, all wheels on mobile scaffolds must be locked.
   f)   An access ladder or equivalent safe access must be provided on all scaffolds.
   g)   Scaffold planks shall extend over their end supports not less than 6" nor more than 12" unless otherwise secured.
   h)   Slippery conditions on scaffolds shall be eliminated as soon as possible.
   i)   All scaffolds must be erected plumb and level.
   j)   Screw jacks shall not be extended to more than 12"
   k)   Scaffolds must be secured or stabilized with outriggers when the height exceeds 4 times the smaller base dimension.  Scaffolds must also be secured every 30' horizontally and 26' vertically.
   l)   Material shall not be stacked more than 24" on scaffold deck.
   m)   Do not rig well wheels, pulley, etc. from guardrails, braces, frames, etc.
   n)   All diagonal braces must be installed prior to use.
   o)   No scaffold shall be erected, moved, dismantled, or altered except under the supervision of a designated competent person.
   p)   Subcontractors using suspension (swing) type scaffolding (one point, two point, four point, etc.) shall have manufacturers and engineering data for the complete system, including outriggers, on the job site for review.
   q)   The use of scaffold erected by DAVIS by subcontractors or other employers will be permitted only upon receipt of a fully executed copy of the DAVIS "Scaffold Release" form.

41.  Excavating and Trenching
   a)   Excavations must be sloped or shored to the proper angle when more than 5' in depth.
   b)   Spoil dirt must be placed at least 2' from the edge of the excavation.
   c)   Excavations must be barricaded at all times when unattended.
   d)   Ladders or other safe means of access must be provided.
   e)   Excavations shall be inspected by a competent person on a daily basis and after rain, snow storms, freezing or thawing.
   f)   Shoring shall be checked daily (or more frequently in extremely wet weather).

42.  The first agenda item addressed in all progress meetings shall be "Safety".  Under this topic allot time to discuss any accidents, injuries and/or near misses on the site since the last meeting and what measures have been instituted to avoid recurrences.  Also discuss how to do the upcoming work in a safe manner.  Pre-planning of safety on a weekly basis will go a long way toward accident prevention.

43.  The "Right to Know" provisions of the Occupational Safety & Health Act require "on a construction site the general contractor or the general contractor's representative shall designate a common location where all independent contractors or employers shall leave their Chemical Information List..."

   It is the policy of the James G. Davis Construction Corporation (DAVIS) that copies of all subcontractor's Chemical Information Lists be provided to the general construction superintendent's office prior to starting work on the site, where they will be held, available to all workers and other authorized personnel, for the duration of the project.  Failure of any subcontractor to provide the required Chemical Information List to the superintendent's office may put the subcontractor in violation of the Act and subject to a formal violation.

   All subcontractors and/or material suppliers are further directed to furnish copies of their Chemical Information Lists (with material Safety Data Sheets where applicable) to DAVIS' main office in Rockville, Md.

44.  Fuel Gas (Acetylene) and Oxygen Protection
   a)   Oxygen and Acetylene, when not on a cart ready for use, must be capped and secured in an upright position and must be separated by either twenty feet (20') (minimum) or a five foot (5') tall 1/2 hour rated wall.
   b)   Flashback arresters are required on all Oxygen and Acetylene torch sets when in use.
   c)   When moving and storing cylinders, be certain that the cylinder valves are closed, caps (not to be used for lifting) are on and the storage space is dry (and, if acetylene, properly ventilated); tilt and roll on bottom edges; avoid dropping, etc; secure acetylene in a vertical position; remove regulators unless secured on cylinder cart; have 10-ABC fire extinguisher on the cart.
   d)   When hoisting cylinders, use pallet, cradle or sling board, not choker sling or magnet.  While in use, secure cylinders to cart with chain or other steadying device.
   e)   When frozen, use warm (not boiling) water (not bars under valves or valve protectors) to pry cylinders loose.
   f)   When work is finished or cylinders are empty, be certain cylinder valves are closed and caps are on.
   g)   When cutting or welding, protect cylinders with distance or fire resistance shields from sparks, hot slag or flame.

00009

Project: Capitol Plaza 1 (15-2315)

Exhibit A

45. Sanitation (1926.51)
   a)   Make sure there is an adequate supply of potable water available at all areas of employment.
   b)   Be certain that containers used for drinking water, if any, are capable of being tightly closed, and equipped with a tap (no dipping); make sure these containers are clearly marked "for drinking water only". (No common drinking cups) Where disposable cups are supplied, provide a container for these cups and another, separate, container for disposal.
   c)   At any outlet for non-potable water post a sign "Unsafe and not to be used for drinking, washing, or cooking purposes".
   d)   Make sure that no one make a cross-connection between potable and non-potable water.
   e)   Make sure there are adequate toilets available (1926.51c)
   f)   Be certain that employees' food handling facilities and operations meet the applicable laws, ordinances, and regulations of the jurisdiction in which they are located.
   g)   Make sure there are adequate washing facilities with liquid soap, paper towels and a trash container. Keep hands clean as much as practicable, particularly from oil, grease or hazards.

46. Pneumatic Power Tools (1926.302b)
   a)   Pneumatic power tools shall be secured to the hose or whip by some positive means to prevent the tool from becoming accidentally disconnected.
   b)   Safety clips or retainers shall be securely installed and maintained on pneumatic impact (percussion) tools to prevent attachments from being accidentally expelled.
   c)   All pneumatically driven nailers, staplers, and other similar equipment provided with automatic fastener feed, which operate at more than 100 p.s.i. pressure at the tool shall have a safety device on the muzzle to prevent the tool from ejecting fasteners, unless the muzzle is in contact with the work surface.
   d)   Compressed air shall not be used for cleaning purposes except where reduced to less than 30 p.s.i. and then only with effective chip guarding the personal protective equipment. (The 30 p.s.i. requirement does not apply for concrete form, mill scale and similar cleaning purposes.)
   e)   The manufacturer's safe operating pressure for hoses, pipes, valves, filters, and other fittings shall not be exceeded
   f)   The use of hoses for hoisting or lowering tools shall not be permitted.
   g)   All hoses exceeding 1/2" inside diameter shall have a safety device at the source of supply or branch line to reduce pressure in case of hose failure.
   h)   Airless spray guns of the type which atomize paints and fluids at high pressures (1,000 pounds or more per square inch) shall be equipped with automatic or visible manual safety devices which will prevent pulling of the trigger to prevent release of the paint or fluid until the safety device is manually released. (In lieu of the above, a diffuser nut which will prevent high pressure, high velocity release, while the nozzle tip is removed, plus a nozzle tip guard which will prevent the tip from coming into contact with the operator, or other equivalent protection, shall be provided.)
   i)   When working in plants or factories, NEVER tap into permanent compressed air lines without approval and under direction of the Owner's representative

47. Hand Tools (1926.301)
   a)   Employers shall not issue or permit the use of unsafe hand tools.
   b)   Wrenches, including adjustable, pipe, end, and socket wrenches shall not be used when jaws are sprung to the point that slippage occurs.
   c)   Impact tools, such as drift pins, wedges, and chisels, shall be kept free of mushroomed heads.
   d)   The wooden handles of tools shall be kept free of splinters or cracks and shall be kept tight in the tool.

48. Lasers (Nonionizing Radiation) (1926.54)
   a)   Only qualified and trained employees shall be assigned to install, adjust, and operate laser equipment.
   b)   Proof of qualification of the laser equipment operator shall be available and in possession of the operator at all times.
   c)   Employees, when working in areas in which a potential exposure to direct or reflected laser light greater than 0.005 watts (5 milliwatts) exists, shall be provided with antilaser eye protection devices.
   d)   Areas in which lasers are used shall be posted with standard laser warning placards.
   e)   Beam shutters or caps shall be utilized, or the laser turned off, when laser transmission is not actually required. When the laser is left unattended for a substantial period of time, such as during lunch hour, overnight, or at change of shifts, the laser shall be turned off.
   f)   Only mechanical or electronic means shall be used as a detector for guiding the internal alignment of the laser.
   g)   The laser beam shall not be directed at employees.
   h)   When it is raining or snowing, or when there is dust or fog in the air, the operation of laser systems shall be prohibited where practicable; in any event, employees shall be kept out of range of the area of source and target during such weather conditions.
   i)   Laser equipment shall bear a label to indicate maximum output.
   j)   Employees shall not be exposed to light intensities above:
         - Direct staring: 1 micro-watt per square centimeter
         - Incidental observing: 1 milliwatt per square centimeter
         - Diffused reflected light: 2 1/2 watts per square centimeter
   k)   Laser unit in operation should be set up above the heads of the employees, when possible.
   l)   Employees shall not be exposed to microwave power densities in excess of 10 milliwatts per square centimeter.

00010

Project: Capitol Plaza 1 (15-2315,

Exhibit A

49.  Steel Erection:

a)  All work shall be performed to the highest standard of safety per the OSHA Requirements as set forth in the Code of Federal Regulations 29CFR Part 1926, Subpart R, and any applicable provisions of Part 1910.

b)  Furnish and install two safety cables around the perimeter of the building, elevator shaft openings, stair openings, mechanical & electrical shaft openings, etc., at all floors where the fall exposure exceeds 6'-0".

- Cables shall be a minimum of 5/16" diameter.
- Cable end terminations and splices shall be made up with two cable clamps each.
- Cables shall be tensioned to maintain a maximum of a 3" deflection under a 200 pound load.
- The top cable shall be marked with plastic ribbon "streamers" spaced approximately 72" on center.

c)  The erection crew shall install a minimum of two bolts, drawn up wrench tight, in each end of each beam before the connector walks out to disconnect it from the hoisting line.

d)  Bolt up men shall use an approved and properly tied off float.  They shall also wear safety harness and life lines.  An alternative to the use of a float is a properly secured ladder of adequate height and slope.  The safety harness and life lines shall still be used.

e)  Installation of metal decking must follow closely behind erection of the structural steel. In no case shall the completed decking be more than two floors (or 25 vertical feet) behind the framing unless safety nets are provided.

f)  Connectors between 15 and 25 feet must wear fall arrest or restraint equipment and be able to be tied off, or be provided another means of fall protection.  All others engaged in steel erection at heights greater than 15 feet must have fall protection. (Both Maryland and Virginia State Plans have more restrictive regulations, which shall be complied with)

50.  Electrical

a)  All subcontractors working on DAVIS projects shall comply with OSHA Standard 1926.4041(b)
_Branch Circuits_. (1) Ground Fault Protection. (i) General. The employer shall use either ground fault circuit interrupters as specified in paragraph (b)(ii) of 1926..404 or an assured equipment grounding conductor program as specified in paragraph (b)(1)(ii) of 1926.404 to protect employees on construction sites.

b)  Each individual subcontractor shall be responsible for ensuring that their employees are protected from electrical hazards by either enforcing the use of portable ground fault circuit interrupters (GFCI) or the active implementation of an assured equipment grounding program.

c)  DAVIS will attempt to have GFCI outlets available throughout all major project sites for the use of the various subcontractors, but due to the dynamics of any construction site DAVIS will not guarantee that availability.  It is the legal responsibility of each subcontractor to provide protection for his employees.

d)  A copy of the DAVIS "Assured Equipment Grounding Program" will be made available to any subcontractor upon request. Subcontractors who do not have a written Assured Equipment Grounding Program are encouraged to establish one immediately.  The DAVIS program may be used as a guide for establishment of such programs.

e)  Most electrical subcontractors on DAVIS projects will administer (for a fee) the Assured Equipment Grounding Program(s) of the subcontractor(s) working on that same site for the electrical equipment on that site. Any such subcontractor/subcontractor arrangements shall be made independently of the DAVIS subcontract agreement.

f)  All energized electrical outlets, switches, or other devices, shall have cover plates in place and be securely mounted to the substrate.

51.  Smoking in the Workplace

Effective March 27, 1995 the State of Maryland began enforcing the law prohibiting smoking in the workplace. It is the policy of the James G. Davis Construction Corporation that this law shall be strictly adhered to on all DAVIS projects in the State of Maryland as follows:

**Smoking is not allowed in a building after exterior walls are installed.**
A building under construction is not considered an enclosed workplace until the exterior walls are in place and the windows are installed. However the office "shacks", change rooms, storage rooms, etc. are considered as enclosed and smoking is prohibited therein, even if you are in there alone or there is only one employee by himself.  In order to comply with the law, smoking is only allowed in a "designated smoking area", and that space must be a "leisure" area where absolutely no work will take place and where non-smokers are not required to enter at any time.

**Post No Smoking Signs**
The law requires that all entrances to the enclosed workplace(s) be posted with "**NO SMOKING**" signs.  Absence of such signs is a violation subject to a MOSH citation and fine.  Signs are enclosed for Maryland jobs.  All Maryland projects are being supplied with NO SMOKING signs with this memorandum.  Please post them immediately.

**No Smoking in Company Vehicles unless Alone**
The prohibition on smoking also extends to company vehicles when more than one employee is inside, even when all employees are smokers.

The new law is enforced by MOSH and the _employer_ (DAVIS) will be cited and fined where violations are found, not the offending employee.  It will be the primary responsibility of the project superintendent to educate all workers (DAVIS and subcontractors) about the law and to enforce the regulations as written.

It is the further policy of DAVIS that smoking and/or the use of other tobacco products (e.g., chewing tobacco and snuff) shall be prohibited in any area of a construction project where the carpet, or other finish floor material, has been installed.  This prohibition applies to all DAVIS projects regardless of where they are (not just in Maryland)

There will also be projects that are by contract requirements to be totally "smoke free".  There will be signs posted to that effect at all project entrances.

Capitol Plaza I
James G. Davis Construction Corporation
General Trades Scope of Work
February 9, 2005

## GENERAL

1. Comply with the requirements of all applicable codes, laws, regulations and restrictions and obtain and pay for all required licenses, permits and inspections.

2. Unless otherwise directed, normal work hours will be between 6:00 am and 3:00 pm. If overtime work is required solely to accelerate project completion, it shall be authorized in writing and paid for by DAVIS. Overtime costs resulting from the subcontractor's failure to provide adequate manpower or proper scheduling shall be borne by the subcontractor.

3. All trades shall conduct themselves in a professional manner while on-site and within the immediate vicinity. No employee or representative of any subcontractor shall engage in foul or abusive language.

4. All workers shall refrain from posting any calendars, pictures or graffiti in or around the building, regarding of ownership which depict inappropriate language or situations.

5. Furnish all labor, equipment, rigging, hoisting and scaffolding necessary to fully and properly receive and stock the building materials necessary for the execution of your portion of the work.

6. Provide proper protection of your materials and equipment while stored on-site.

7. Layout of your work from benchmarks and control lines established by Davis. Benchmarks and control lines will generally be provided at 100 foot intervals by Davis.

8. Subcontractor shall not post signs on the project unless given permission by Davis.

9. All welding apparatus used on the project shall be diesel or gas generated.

10. Subcontractors will be provided electrical service for small tools only and shall provide their own OSHA approved extension cords. DAVIS will not provide power for trailer hook-ups, welders, or large equipment unless approved in advance.

11. Temporary cold, potable water service will be provided by Davis on site. Each subcontractor shall provide their own hoses for water distribution. DAVIS will not provide water for trailer hook-ups or large equipment unless approved in advance.

12. Contain/ clean up water generated as the result of your work and remove water to the dumpster; no concrete, grout, spackle or joint compound, etc. shall be allowed in the storm or sanitary sewers or in plumbing lines and fixtures.

13. Subcontractor acknowledges that there is no parking on site available on site for tradesmen, supervisors, or visitors.

14. Tradesmen will be allowed one designated area for eating. No drinks or food are to be consumed in other areas of the building. Smoking will be prohibited entirely within the building envelope.

00012

Capitol Plaza I
James G. Davis Construction Corporation
General Trades Scope of Work
February 9, 2005

## SAFETY

1. Develop and implement a safety program for all employees. At all times, comply with OSHA and DAVIS safety standards and regulations. Comply with the direction of the DAVIS Superintendent in all matters regarding safety.

2. Ensure your employees, deliverymen, and subcontractors are equipped with appropriate safety gear while on site, including, but not limited to, hardhats, work boots, and eye protection.

3. Provide flagmen and traffic control for your work including deliveries.

4. Provide one laborer for each ten men on site, or fraction thereof, for 8 hours each week for participation in the communal clean-up crew of the common areas of the building and site. This requirement is in addition to your requirement to clean up your debris under item 21 of the subcontract agreement.

5. The playing of radios / stereos on the job is not allowed.

## SUBMITTALS

1. At a minimum, submit for approval all items required by the specifications and/or listed in the DAVIS submittal control log. Provide additional submittals as may be required or requested for coordination or clarification.

2. Furnish submittals in a timely manner consistent with the project schedule.

3. Field measurements for your work to verify clearances, structural tolerances and other restrictions inherent in the building structure and its environment.

4. Coordination of your work with other trades.

5. Purchase contract documents for your work and as necessary for your field personnel, suppliers, subcontractors, etc. Each subcontractor will be furnished with two complete sets of contract documents.

## COORDINATION, SCHEDULING AND REPORTING

1. Coordinate your work fully with the work of other trades. Review jobsite procedures and requirements with the DAVIS Superintendent before beginning work.

2. Coordinate all material and equipment deliveries 24 hours in advance with the DAVIS Superintendent.

3. Submit **daily** foreman's reports detailing progress and manpower to the DAVIS Superintendent.

4. Attend regularly scheduled progress meetings. The representative attending progress meetings (preferably the subcontractor's project manager) shall have the authority to commit the resources of the firm. Report on the status of submittals, material/equipment deliveries, schedule progress, coordination issues, etc.

5. Work in accordance with the published project schedule and at the direction of the DAVIS superintendent. The DAVIS superintendent has the right to adjust the project schedule as needed.

00013

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## CONSTRUCTION INDUSTRY ARBITRATION RULES
### Demand for Arbitration

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box. ☐ There is no additional administrative fee for this service.*

| Name of Respondent<br>Trainor Glass Company | Name of Representative (if known)<br>Tom Trainor | | |
|---|---|---|---|
| Address:<br>11901 S. Austin Ave. | Name of Firm (if applicable) | | |
| | Representative's Address: | | |

| City<br>Alsip | State<br>IL | Zip Code<br>60803 | City | State | Zip Code |
|---|---|---|---|---|---|
| Phone No.<br>(708) 388-5700 | | Fax No.<br>(708) 388-9359 | Phone No. | | Fax No. |
| Email Address: | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated April 4, 2005 _____, which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration.

ARBITRATION CLAUSE CONTAINED IN THE FOLLOWING CONTRACT DOCUMENT: (Please check one)
☐ AIA-American Institute of Architects ☐ AGC-Associated General Contractors of America ☐ DBIA-Design Build Institute of America ☐ EJCDC-Engineers Joint Contract Documents Committee ☐ ASA-American Subcontractors Association ☐ CMAA-Construction Management Association of America ☒ Other (specify) Written Subcontract Agreement

**THE NATURE OF THE DISPUTE**

SEE ATTACHED "NATURE OF DISPUTE"

| Dollar Amount of Claim $ 2,322,000.00 | Other Relief Sought: ☐ Attorneys Fees ☒ Interest<br>☐ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other ____ |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $ 8,000.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Lawyers with construction contract and dispute experience

| Hearing locale Washington, D.C. metro area    (check one) ☒ Requested by Claimant ☐ Locale provision included in the contract |
|---|

| Estimated time needed for hearings overall:<br>____ hours or   3   days | Specify type of business: Claimant General Contractor<br>Respondent Glass and Glazing Subcontractor |
|---|---|

**You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☒ Atlanta, GA ☐ Dallas, TX ☐ East Providence, RI ☐ Fresno, CA ☐ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.**

| Signature (may be signed by a representative)    Date:<br>*J. Richard Margulies*    5/31/07 | Name of Representative<br>J. Richard Margulies |
|---|---|
| Name of Claimant<br>James G. Davis Construction Corporation | Name of Firm (if applicable)<br>J. Richard Margulies & Associates, Ltd. |
| Address (to be used in connection with this case)<br>12530 Parklawn Drive | Representative's Address<br>1 Church Street, Suite 303 |

| City<br>Rockville | State<br>MD | Zip Code<br>20852 | City<br>Rockville | State<br>MD | Zip Code<br>20850 |
|---|---|---|---|---|---|
| Phone No.<br>(301) 881-2990 | | Fax No.<br>(301) 468-3918 | Phone No.<br>(301) 738-2470 | | Fax No.<br>(301) 738-3705 |
| Email Address:<br>www.davisconstruction.com | | | Email Address:<br>jrmargul@starpower.net | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 8

**EXHIBIT B**

Capitol Plaza 1
East Coast Glass Systems / DAVIS Agreement No. 15-2315-017

**11. TIME IS OF THE ESSENCE**
Subcontractor shall proceed with work at such time and in such sequence as DAVIS may direct, including overtime performance as necessary and as required by Schedule of Progress, which may be subject to change as working conditions require. If overtime is required solely to accelerate project completion, it shall be authorized in writing and be paid for by DAVIS. ~~Payments due may be withheld to insure timely progress and completion of work.~~ The Subcontractor shall be liable for all losses and damages incurred by DAVIS (including consequential damages) due to inexcusable delay of the Subcontractor in the performance of the work, including delays costs not reimbursable from the Owner due to inexcusable incurred delays of the Subcontractor.

**12. EXTENSIONS OF TIME**
Subcontractor shall be entitled to an extension of time for performing and completing the work covered by this agreement upon the same terms and conditions an extension of time is allowable and only to the extent actually allowed to DAVIS by Owner, or its representative, under the terms of the Prime Contract. Notice of the excusable delay shall be given to DAVIS in writing within three (3) calendar days from the beginning of said delay in order that DAVIS may in turn notify the Owner, and if not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject only to the disputes procedure provided in the Prime Contract.

**13. DAMAGES FOR DELAY**
DAVIS shall not be liable to Subcontractor for unforeseeable delay occurring beyond DAVIS's control or for delay caused by Owner or other subcontractor. Subcontractor shall be entitled to reimbursement for any damages for delays recovered from the Owner only, and the Subcontractor shall have the right, at its expense, against the Owner to exercise all provisions of the Prime Contract to recover said damages. Time extension only shall be granted for delays caused solely by DAVIS.

**14. SCHEDULE**
DAVIS intends to schedule this project using CPM Schedule techniques. In such event, Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of DAVIS's written notice and request.

**15. DEFAULT TERMINATION**
The following shall be deemed a breach of this Agreement: Failure to fulfill any obligation of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities; failure to pay for labor and material, payroll taxes, contributions, or insurance premiums; interference with the performance of the work by others for any reason; and an act of bankruptcy. If the Subcontractor breaches the Subcontract, DAVIS may terminate Subcontractor's right to proceed upon three (3) days written notice. DAVIS may then have the work completed, ~~and may use Subcontractor's material, supplies, tools, and equipment to complete.~~ Subcontractor and its surety shall continue liable for all costs to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by Owner and other liabilities which may result from the default and breach, without waiver or any other rights or remedies available to DAVIS, ~~including right of setoff and collection of any funds which may be due to Subcontractor under other subcontracts with DAVIS.~~

**16. EXTRA WORK**
Only extra work authorized by DAVIS as an extra or change in writing shall be paid for. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the costs of said work plus fifteen percent (15%) for overhead, profit, supervision, and small tools, which will constitute the entire amount due the Subcontractor for the extra work.

**17. OWNER CHANGES**
Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute ~~and appeal, provided reservation and exercise of said rights do not interfere with the progress of the work.~~

**18. CONTRACT INTERPRETATION**
DAVIS interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if claim in writing is made within five (5) days after ruling and direction.

**19. DISPUTES**
Disputes arising out of Owner acts, omissions, or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise those rights at its sole cost and shall be bound thereby. DAVIS shall have no direct liability except to give Subcontractor opportunity to exercise rights in the Prime Contract. Disputes with DAVIS shall be resolved by arbitration in accordance with the rules of the American Arbitration Association. Disputes shall not interfere with the progress of the job. Work shall proceed as ordered, subject to claim.

**20. BACKCHARGES**
All charges and backcharges assessed by DAVIS against Subcontractor shall be deemed accepted unless rejected in writing within thirty (30) days.

**21. PLANT AND CLEANUP**
Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective, and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris, etc., on a daily basis, unless DAVIS directs otherwise. Upon completion of the subcontract work, all Subcontractors' materials, equipment, etc., must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit DAVIS to do so and backcharge Subcontractor for the cost. If Subcontractor uses DAVIS's hoist, scaffolding, or facilities, it will be responsible for the operating expenses of such equipment when in use for Subcontractor's benefit.

Subcontractor Initial _____   Contractor Initial _PRE_

00003

Demand for Arbitration
By: James G. Davis Construction Corporation

## NATURE OF DISPUTE

1. On or about April 4, 2005, James G. Davis Construction Corporation ["DAVIS"] and East Coast Glass Systems entered into a written fixed-price Subcontract Agreement whereby East Coast Glass Systems agreed to provide the entire Glass and Glazing System for the Capitol Plaza 1 project (the "curtainwall" subcontract). The subcontract price was $4,087,171. It was the second largest subcontract awarded on the project.

2. On or about October 26, 2006 DAVIS was asked by East Coast Glass Systems and Trainor Glass Company, Inc. to consent to an assignment of the Subcontract from East Coast Glass Systems to Trainor Glass Company, Inc. in conjunction with a sale of assets from East Coast Glass Systems to Trainor Glass Company, Inc. DAVIS consented to that assignment.

3. At the time that the Subcontract Agreement was assigned to Trainor Glass Company, Inc., East Coast Glass was in substantial default. The curtainwall system should have been complete many months before and was delaying substantial completion of the project.

4. On or about October 25, 2006, DAVIS advised East Coast Glass Systems/Trainor Glass Complany, Inc. (hereinafter "the Curtainwall Subcontractor") by certified letter that the Owner had commenced assessment of liquidated damages, and that these would be passed on to the Subcontractor in accordance with the terms of the Subcontract Agreement because the Subcontractor's failure to timely perform was delaying substantial completion. However, at that time the Curtainwall Subcontractor was on the order of 85% complete. DAVIS orally advised the Curtainwall Subcontractor that if it substantially completed the curtainwall system by November 30, DAVIS would absorb the liquidated damages.

5. The Curtainwall Subcontractor did not improve its performance or otherwise diligently pursue its Subcontract obligations. DAVIS was required to augment the forces of the Curtainwall Subcontractor with other subcontractors, and DAVIS was required to pay the Curtainwall Subcontractor's material suppliers in order to get materials delivered to the project and get the curtainwall work completed. The Curtainwall Subcontractor did not substantially complete its work until March 26, 2007, thereby delaying substantial completion of the project to that date.

6. The Curtainwall Subcontractor did not perform in accordance with the requirements of the Subcontract Agreement:

        a. The Curtainwall Subcontractor failed to provide a performance bond;

b. The Curtainwall Subcontractor failed to provide a sufficient number of qualified and competent management and workmen and as a direct and proximate result the curtainwall work contained numerous deficiencies, and it was finished late, delaying substantial completion of the project;

c. The Curtainwall Subcontractor failed to pay its sub-subcontractors/material suppliers;

d. The Curtainwall Subcontractor failed and refused to provide the warranties required by the contract documents;

e. The Curtainwall Subcontractor failed and refused to correct all of the punchlist items identified by the architect.

7. As a direct and proximate result of the Curtainwall Subcontractor's numerous breaches of contract, DAVIS has incurred damages of $2,322,000.

WHEREFORE, DAVIS respectfully demands an AWARD in the amount of $2,322,000 plus interest and the costs of arbitration.

Respectfully submitted,

J. Richard Margulies, Esq.
Attorney for James G. Davis Construction Corporation

James G. Davis Construction Company    )
                                        )
and                                     )
                                        )
Trainor Glass Company, Inc.             )
                                        )

## TRAINOR GLASS COMPANY'S OBJECTION TO JURISDICTION

Pursuant to American Arbitration Association Rule 8, Trainor Glass Company ("Trainor") objects to arbitration jurisdiction based on the following:

1.    This matter is not arbitrable because there is no agreement between Trainor and Davis to arbitrate.

2.    East Coast Glass ("ECG") and James G. Davis Construction Corporation ("Davis") entered into a subcontract dated April 4, 2005 whereby ECG was to furnish and install a curtainwall system for the Capital Plaza I project in Washington D.C. The subcontract contained an arbitration provision.

3.    Trainor acquired the assets of ECG on November 3, 2006. Prior to that date, Trainor and ECG sought Davis' consent to assign the Capital Plaza I subcontract to Trainor. Trainor prepared and tendered a consent to Davis in the form attached hereto as Exhibit A.

4.    In the consent form which it tendered to Davis, Trainor proposed to complete the unpaid balance of the subcontract attributable to work which was to be performed after the assignment date.

5.    Davis computed the unpaid contract balance but also added a material change to the terms of the consent prepared by Trainor. See Exhibit B, last clause of paragraph 2, regarding unresolved claims.

**EXHIBIT C**

1

6.    This material change was rejected by Trainor, and the consent was returned to Davis with the rejected changes.  See Exhibit C attached hereto.

7.    Thereafter, the parties did not come to a final agreement as to the material terms of the consent, and Davis now claims it never agreed to the final consent proposal offered by Trainor.  See Exhibit C.

8.    Absent a mutually agreed upon consent, there was not an assignment of the ECG – Davis subcontract to Trainor, and Trainor did not become bound by the arbitration provision of the Davis – ECG agreement.

WHEREFORE, Trainor asks the above arbitration claim be dismissed for lack of jurisdiction.

Respectfully submitted,

_____
Richard D. Trainor
Attorney for Trainor Glass Company

Richard D. Trainor
Richard D. Trainor, Ltd.
33 N. Dearborn, Suite 1700
Chicago, IL 60602
(312) 346-2708

2

James G. Davis Construction Company    )
   )
and    )
   )
Trainor Glass Company, Inc.    )

## TRAINOR GLASS COMPANY'S COUNTERCLAIM

### Count I – Recovery under Promissory Estoppel

1. Trainor Glass Company, an Illinois corporation, ("Trainor") purchased assets of East Coast Glass ("ECG") on or about November 3, 2006.

2. In connection with the purchase of ECG assets Trainor sought assignment of certain ongoing subcontracts of ECG.

3. At the time of the asset purchase by Trainor, ECG was engaged in the installation of the curtainwall system on the Capitol Plaza project pursuant to its subcontract with the James G. Davis Construction Company ("Davis").

4. The Davis – ECG subcontract prohibited assignment of same without the written consent of Davis.

5. Accordingly, Trainor contacted Davis and offered to complete the Capital Plaza project for the portion of the subcontract price attributable to the work to be performed.

6. Davis, through its agents and employees, advised Trainor that ECG was behind schedule on the project. Davis further advised and represented to Trainor that Davis would not assess liquidated damages against Trainor if Trainor undertook the project and used its best efforts to complete the curtainwall system to avoid further delay to the project.

7. Trainor sent a proposed consent to Davis.

**EXHIBIT D**

1

8. In reliance upon the representations of Davis, Trainor Glass undertook the completion of the Capitol Plaza project for the balance of the subcontract price attributable to the uncompleted work, $701,908.20.

9. Commencing on November 6, 2006 and continuing to the date of substantial completion, Trainor Glass personnel spent substantial labor hours on the project and incurred material costs.

10. Trainor Glass undertook the project in reliance upon representations of agents of Davis that Trainor would not be assessed liquidated damages for delays which were attributable to ECG and occurring before Trainor's purchase of ECG's assets.

11. In reliance upon the promise of Davis, concerning liquidated damages, Trainor Glass assumed the financial risk that it would cost Trainor more to complete the project than the unpaid subcontract balance. To date, Trainor has spent $1,173,238.70 to complete the curtainwall installation, all of which remains unpaid.

12. Davis sought to receive contract completion by Trainor for the balance of the subcontract price in return for its convenant not to assess liquidated damages for delays attributable to ECG and which necessarily occurred prior to Trainor's purchase of ECG. Trainor relied to its economic detriment on Davis' promise not to assess liquidated damages.

13. Trainor Glass has performed all of its obligations under its agreement with Davis. But for the promise of Davis that it would not seek to assess liquidated damages against Trainor, Trainor would not have undertaken the Capitol Plaza project.

14. Davis breached its agreement not to assess liquidated damages against Trainor.

15. As a result of the breach of its promise by Davis, Trainor has suffered damages in the amount of $1,173,238.70

WHEREFORE, Trainor Glass Company seeks an arbitration award in the amount of $1,173,238.70

## Count II – Breach of Contract

1. On or about October 26, 2006, Trainor and Davis made an agreement whereby Trainor was to furnish labor and material in order to complete a curtainwall and other improvements to the premises at Capitol Plaza I in exchange for payment by Davis in the amount of $708,908.00.

2. Trainor furnished labor and material between November 6, 2006 and may 31, 2007 and performed its obligations under the agreement.

3. There remains unpaid the sum of $414,164.00.

WHEREFORE, Trainor seeks an arbitration award in the amount of $414,162 plus interest and costs of this arbitration.

## Count III – Quantum Meruit

1-3 Trainor re-alleges Paragraphs 1-3 of Count II as Paragraphs 1-3 of Count III.

4. In the event the arbitration panel finds that the agreement alleged by Trainor in Count II whereby Trainor furnished materials and labor to Davis to be unenforceable. Trainor alleges it furnished labor and material at specific request of Davis for use in conjunction with the improvements to the premises.

3

5. Trainor furnished all of said labor and material between November 6, 2006 and May 31, 2007.

6. The labor and materials furnished are reasonably worth $1,173,238.70.

7. Davis has wrongfully and unreasonably withheld payment of the amount justly due.

WHEREFORE, Trainor Glass Company seeks an arbitration award in the amount of $1,173,238.70.

Respectfully submitted,

_____
Richard D. Trainor
Attorney for Trainor Glass Company

Richard D. Trainor
Richard D. Trainor, Ltd.
33 N. Dearborn, Suite 1700
Chicago, IL 60602
(312) 346-2708

4

EXHIBIT A

## CONSENT TO ASSIGNMENT OF SUBCONTRACT

Whereas East Coast Systems, Inc. (East Coast) has entered into a subcontract with James D. Davis Construction Corporation, (Davis) dated May 2005 to provide labor and materials in connection with Capital Plaza I.

Whereas East Coast has entered into a letter of intent with Trainor Glass Company, Inc., (Trainor) for the sale of the assets of East Coast to Trainor.

Whereas the subcontract between East Coast and Davis requires the consent of Davis for any assignment of the subcontract.

Now therefore, in consideration of the payment of ten (10) dollars and other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    As of the assignment date, the adjusted subcontract price is $_____ and there have been no changes, claims, or costs incurred through the referenced date that have not been accounted for in the adjusted subcontract price.

2.    As of the assignment date, East Coast Glass Systems, Inc. has been paid $_____ against the adjusted subcontract price with the difference represented by retainage in the amount of $_____ being held by the Owner or the amount of $_____ owed to East Coast for work or materials furnished prior to the assignment date. The portion of the adjusted subcontract price attributable to the work to be performed or materials to be provided after the assignment date is $_____.

3.    Davis consents to the assignment of the subcontract with East Coast Glass Systems, Inc. to Trainor Glass Company, Inc. effective as of the assignment date.

4.     Trainor Glass Company agrees to complete the remaining obligations and scope of the work under subcontract.

5.     As of the assignment date, Davis shall pay Trainor all sums, including retainage for work performed or materials supplied under the subcontract, in accordance with subcontract payment provisions.

6.     Trainor shall be bound directly to Davis under the terms and conditions of the subcontract and any other contract documents referenced or incorporated therein after the assignment date.


So agreed this _____ day of _____, 2006.


_____
James D. Davis Construction Corporation

By: _____
        Print name


_____
East Coast Glass Systems, Inc.

By: _____
        Print name


_____
Trainor Glass Company, Inc.

By: _____
        Print name

EXHIBIT B

## CONSENT TO ASSIGNMENT OF SUBCONTRACT

Whereas East Coast Systems, Inc. (East Coast) has entered into a subcontract with James

D. Davis Construction Corporation, (Davis) dated May 2005 to provide labor and

materials in connection with Capital Plaza I.

Whereas East Coast has entered into a letter of intent with Trainor Glass Company, Inc

(Trainor) for the sale of the assets of East Coast to Trainor.

Whereas the subcontract between East Coast and Davis requires the consent of Davis for

any assignment of the subcontract.

Now therefore, in consideration of the payment often (10) dollars and other good and

valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties

agree as follows:

1.      As of 26 October, 2006, the adjusted subcontract price is $ 4,087,171.00.  There have

been no changes, claims, or costs incurred through the referenced date that have not been

accounted for in the adjusted subcontract price, except for pending change orders and claims

which have not been resolved.

2.      As of 26 October 2006, East Coast Glass Systems, Inc. has been paid $2,833,256.00

against the adjusted subcontract price with the difference represented by retainage in the amount

of $ 338,526.22 being held by the Owner.  The portion of the adjusted subcontract price

attributable to the work to be performed or materials to be provided after 26 October 2006 is

$701,908.20 except for pending change orders and claims which have not been resolved.

3.      Davis consents to the assignment of the subcontract with East Coast Systems, Inc. to

Trainor Glass Company, Inc. effective as of the assignment.

4. Trainor Glass Company agrees to complete the remaining obligations and scope of the work under subcontract.

5. As of 26 October 2006, Davis shall pay Trainor all sums, including retainage for work performed or materials supplied under the subcontract, in accordance with subcontract payment provisions.

6. Trainor shall be bound directly to Davis under the terms and conditions of the subcontract and any other contract documents referenced or incorporated therein after 26 October 2006 in accordance with the provisions of the contract.

So agreed this 26th day of October 2006.

James D. Davis Construction Corporation
By: Margaret M. Jones,
Sr. Vice President, Finance

East Coast Glass Systems, Inc.
By: _____
        (Print Name)

Trainor Glass Company, Inc.
By: _____
        (Print Name)

EXHIBIT C

## CONSENT TO ASSIGNMENT OF SUBCONTRACT

Whereas East Coast Systems, Inc. (East Coast) has entered into a subcontract with James D. Davis Construction Corporation, (Davis) dated May 2005 to provide labor and materials in connection with Capitol Plaza I

Whereas East Coast has entered into a letter of intent with Trainor Glass Company, Inc (Trainor) for the sale of the assets of East Coast to Trainor.

Whereas the subcontract between East Coast and Davis requires the consent of Davis for any assignment of the subcontract.

Now therefore, in consideration of the payment often (10) dollars and other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    As of 2d October, 2006, the adjusted subcontract price is $4,087,171.00. There have been no changes, defaut, or costs incurred through the referenced date that have not been accounted for in the adjusted subcontract price, except for pending change orders and claims which have not been resolved.

2.    As of 26 October 2006, East Coast Glass Systems, Inc. has been paid $2,833,254.00 against the adjusted subcontract price with the difference represented by retainage in the amount of $ 294,506.23 being held by the Owner. The portion of the adjusted subcontract price attributable to the work to be performed or materials to be provided after 26 October 2006 is $701,305.20 except for pending change orders and claims which have not been resolved.

3.    Davis consents to the assignment of the subcontract with East Coast Systems, Inc. to Trainor Glass Company, Inc. effective as of the assignment.

DELETED BY
TRAINOR
NOT INITIALED
BY DAVIS

4. Trainor-Glass Company agrees to complete the remaining obligations and scope of the work under subcontract.

5. As of 26 October 2006, Davis shall pay Trainor all sums, including retainage for work performed or materials supplied under the subcontract, in accordance with subcontract payment provisions.

6. Trainor shall be bound directly to Davis under the terms and conditions of the subcontract and any other contract documents referenced or incorporated therein after 26 October 2006 in accordance with the provisions of the contract.

So agreed this 26th day of October 2006.

_Margaret D. Jones_
James D. Davis Construction Corporation
By: Margaret M. Jones,
Sr. Vice President, Finance

_Darin E. Forrest_
Rust Coast Glass Systems, Inc.
By: _DARIN E. FORREST JR_
(Print Name)

_Thomas D. Trainor_
Trainor Glass Company, Inc.
By: _Thomas D. Trainor_
(Print Name)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAINOR GLASS COMPANY,             *

      Plaintiff,                     *

                                       **Case No. 1:07-cv-01497**

v.                             *        **Judge Royce C. Lamberth**

JAMES G. DAVIS CONSTRUCTION     *
      CORPORATION, *et al,*

                                  *

      Defendants.                 *

## ORDER

Having considered the Motion for Order Dismissing Pending Arbitration and

Request for Hearing on Motion for Order Dismissing Pending Arbitration filed by

Plaintiff Trainor Glass Company, Defendant James G. Davis Construction Corporation's

opposition thereto, and the record herein, it is this ___ day of _____, 2007,

hereby

      ORDERED that Plaintiff Trainor Glass Company's Motion for Order Dismissing

Pending Arbitration is DENIED; and it is further

      ORDERED that Plaintiff Trainor Glass Company's Request for Hearing on

Motion for Order Dismissing Pending Arbitration is DENIED.


                                _____
                                 Judge Royce C. Lamberth
                                 U.S. District Court for the District of Columbia

Copies to:

Stephen M. Seeger, Esq.
Emily D. Gooding, Esq.
Quagliano & Seeger, P.C.
2620 P Street, N.W.
Washington, D.C. 20007

Kevin M. Tracy, Esq.
McNamee, Hosea, Jerigan, Kim,
   Greenan & Walker, P.A.
6411 Ivy Lane, Suite 200
Greenbelt, Maryland 20770